NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1003n.06

No. 10-1686

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Sep 12, 2012*

DEBORAH S. HUNT, Clerk

LIDOCHEM, INC., a New Jersey Corporation
and FRANK DEAN,

       Plaintiffs - Appellants,

v.

STOLLER ENTERPRISES, INC., et al.,

       Defendants - Appellees

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

Before: BOGGS and STRANCH, Circuit Judges, and THAPAR,[*] District Judge.

**JANE B. STRANCH, Circuit Judge.** LidoChem, Inc., and Frank Dean appeal the district court's grant of summary judgment in favor of Stoller Enterprises, Inc., Jerry Stoller, David Alexander, Michael Wright, and McKenzie Wright Laboratories, LLC in this dispute between business competitors in the Michigan farm-chemicals market. The district court ruled that LidoChem and Dean could not prevail on their claims for false or misleading promotion under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), tortious interference with business interests, injurious falsehood, and civil conspiracy. The court also ruled in favor of Stoller Enterprises and Alexander on the defamation claim. We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

---

[*]Hon. Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. FACTS

Don and Lisa Pucillo formed LidoChem as a New Jersey corporation in 1981 to distribute chemical products. LidoChem entered the agricultural chemical business in western Michigan in the late 1990's. In 1999, LidoChem hired chemist Frank Dean, a Texas resident, and sales representative Gerry Gelder, a Michigan resident, to assist LidoChem with its business expansion. Dean and Gelder worked for Stoller Enterprises before they joined LidoChem.

LidoChem's products were blended by The Andersons, a large midwestern chemical manufacturer. LidoChem sold its products to Michigan distributors, including Zeeland Farm Services and Green Valley Agriculture. The distributors then sold the products to farmers. Stoller Enterprises is a Texas corporation engaged in the sale of agricultural chemicals in Michigan and other farm markets. Jerry Stoller owns the company, and David Alexander serves as a Michigan sales representative. Michael Wright, also a Texas resident, is President of McKenzie Wright Laboratories, LLC.

In 2000, the Pucillos joined Valagro, an Italian speciality-fertilizer company, in a business venture to form a new Delaware corporation called Nutrecology, Inc. Nutrecology employed Dean to develop a liquid fertilizer, Nutrefol, to compete with Stoller Enterprises' similar product, Foli-Zyme. Nutrecology utilized LidoChem's distribution network in Michigan to market the product.

In March 2001, Gelder and a salesman for Zeeland Farm Services met with the owners of Boersen Farms, a large farming operation in western Michigan and one of Zeeland's largest customers. Gelder asked the Boersens to try LidoChem's and Nutrecology's products for the 2001 growing season, instead of the Stoller Enterprises products that Boersen used in 2000. Dennis

2

Boersen alleged that Gelder told him that Nutrefol would work like Foli-Zyme to enhance the growth of soybeans, but Gelder denied making any such representation. Boersen agreed to try Nutrefol and purchased the product through LidoChem's distributors, Zeeland Farm Services and Green Valley Agriculture.

In May 2001, Boersen sprayed a mixture of Nutrefol and Roundup on 2500 acres of soybeans, but the plants turned yellow and became stressed. Boersen contacted Wally Gerst, a distributor for Stoller Enterprises, for advice. After examining the soybean fields, Gerst recommended the use of Stoller products to encourage plant recovery.

In July 2001, Gerst asked Stoller and Alexander to accompany him to Boersen Farms to discuss the effect of Nutrefol on the soybeans. Stoller assured Boersen that Nutrefol contained a substance that was harmful to soybeans. Stoller obtained a Nutrefol sample from the farm, and Gerst obtained a copy of Nutrefol's material safety data sheet (MSDS)[1] from Zeeland Farm Services.

LidoChem and Dean alleged that Stoller orchestrated a plan to ruin their reputations within the farm chemicals industry by making misrepresentations that Nutrefol contained "poison" so that LidoChem could not compete in the marketplace. They asserted that Stoller's animosity against them developed for several reasons: LidoChem hired Dean and Gelder away from Stoller Enterprises; Dean applied for a provisional patent shortly after joining LidoChem utilizing research Stoller Enterprises claimed to own; and Stoller blamed Dean for the death of Stoller's son.

---

[1]A material safety data sheet details the health effects of a hazardous chemical, provides the signs and symptoms of exposure, and lists any medical conditions generally known to be aggravated by exposure to the chemical. *See Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 430 (6th Cir. 2009).

3

LidoChem and Dean produced proof that Stoller advanced a scheme to represent falsely that Dean added 2-phenylbutyric acid (2-PBA) to Nutrefol, a chemical that Stoller claimed was toxic to plants and caused the reduced soybean harvest at Boersen Farms. As a result of Stoller's alleged statements, Nutrecology pulled Nutrefol from the market in late 2001. In addition, LidoChem and Dean presented proof that Stoller repeatedly encouraged Boersen Farms and its attorneys to file a lawsuit against LidoChem, Dean, Nutrecology, The Andersons, Zeeland Farm Services, and Green Valley Agriculture in Michigan state court. LidoChem asserted that, once the lawsuit became public and farmers, distributors, and blenders became aware of the false claim that Nutrefol contained a toxic chemical, LidoChem lost its business relationships and its ability to compete.

At issue are several communications Stoller made to others. On September 13, 2001, Stoller sent a memorandum to Calvin Hartzog, Product Development Manager for Stoller Enterprises, with copies to Alexander and Gerst. Stoller alleged that Nutrefol was toxic and damaged Boersen Farms' soybeans. He directed Hartzog to send the Nutrefol sample obtained from Boersen Farms to Dr. Benjamin Mosier, a chemist, with instructions to analyze the sample for any toxic ingredients.

In a September 14 email to Gerst, Stoller reported that Nutrefol's MSDS sheet was wrong and that the Nutrefol sample was being analyzed for toxins. Stoller also stated that LidoChem, Dean, Gelder, Zeeland Farm Supply, and Green Valley Agriculture were liable for the Boersens' 2001 crop damage, but he surmised that they might have little money to pay a judgment, while The Andersons had "deep pockets." Stoller predicted that The Andersons would refuse to blend products for LidoChem if Boersen Farms named The Andersons as a defendant in a lawsuit.

4

Sometime thereafter, Stoller learned that Dr. Mosier did not find any toxic chemicals in Nutrefol. Not satisfied, Stoller instructed Hartzog to arrange for Michael Wright of McKenzie Wright Laboratories to re-test the Nutrefol sample. According to Hartzog, Stoller knew that McKenzie Wright would provide the test result Stoller wanted.[2]

In March 2002, Stoller met with Wright, Hartzog, and Mark Wiltse, EPA registration specialist for Stoller Enterprises. Stoller directed Wright to issue a report finding that the Nutrefol sample taken from Boersen Farms contained 2-PBA and that the 2-PBA was masked by long-chain fatty acids. Wright produced the false report for Stoller in June 2002. Hartzog notified Alexander of the false test result, exclaiming, "We got 'em." Stoller also informed Alexander about the false test result. Alexander then communicated the results of Wright's false lab testing directly to Dennis Boersen. Alexander met with Boersen Farms' attorney three times, and he agreed to serve as a witness in a lawsuit Boersen Farms planned to file against LidoChem, Dean, and others.

Between September 2002 and August 2003, Stoller sent six letters to the law firm representing Boersen Farms, encouraging the attorneys to file a lawsuit. Stoller sent copies of some of these letters to Alexander. It was common knowledge in the very small industry for farm chemicals that Stoller pushed the lawsuit against LidoChem and the other defendants.

---

[2]According to Hartzog, McKenzie Wright provided a favorable test report in early 2001 when Stoller Enterprises added thiourea, a banned Class 3 carcinogen, to a new farm-chemical product. When Dr. Mosier reported that cotton plants grown with the product tested positive for thiourea in the leaves, Stoller instructed Hartzog to find a different laboratory, and Hartzog located McKenzie Wright.

In the letters to the attorneys, Stoller claimed that Nutrefol's MSDS was falsified and that Nutrefol was shipped and sold without a proper MSDS. He described The Andersons as a company with "very deep pockets" and disclosed that Alexander had visited The Andersons' president, Rod Enry, to discuss Nutrefol. Stoller claimed that Gelder falsely represented to Boersen that Nutrefol was the same as Foli-Zyme. He asserted that Dean had a "history of changing formulations" and using "customers as an experimental laboratory." He also claimed that Stoller Enterprises had worked for months, employing "numerous lab analyses and specialized equipment," to isolate the damaging ingredient in Nutrefol, 2-PBA, which he said had been "cleverly disguised." He provided Wright's lab report and Dean's patent, which he alleged Dean obtained using research taken from Stoller Enterprises. Stoller suggested the law firm had a "very good case" and requested payment of $20,000 or ten percent of any damages recovery, whichever was greater, to reward Stoller Enterprises for its discovery of the harmful ingredient in Nutrefol. He also agreed to serve as an expert witness.

At his expert deposition held in mid-February 2006, Stoller conceded that he was not a chemist, that he spent his own money conducting laboratory analysis of Nutrefol, and that he had a proprietary interest in the lawsuit. Shortly after the deposition, Stoller sent another letter to the law firm providing suggestions for how to respond to the defense expert's opinion that Roundup, not Nutrefol, harmed the soybeans. Stoller assured the attorneys that this was "a red herring" and that it would be difficult for the defense to claim that Nutrefol was not tested by a good chemist because "Wright Laboratories is recognized by the federal government."

6

By May 2006, Stoller became concerned that Gerst had started distributing LidoChem products. In an email dated May 11, 2006, Stoller denied Gerst the right to access research samples of Stoller Enterprises products because Gerst was "doing business with Frank Dean, who stole private information" from Stoller's company. When Gerst complained that Stoller had directed Alexander to pursue Gerst's largest accounts, Stoller sent Gerst another email on May 22 calling Dean "a dishonest person and a thief." On May 24, Stoller sent another email to Gerst, listing business associates he considered loyal to him, but accusing Gerst of doing business with "a known crook who stole from me."

In late 2006, Stoller withdrew as an expert witness for Boersen Farms. In January 2007 the Michigan trial court barred Wright from testifying as an expert because he disposed of the Nutrefol samples that Stoller gave him to test and he also claimed that his computer "crashed" so that he no longer possessed the underlying data and testing procedure that formed the basis for his opinion that Nutrefol contained 2-PBA. Boersen Farms and LidoChem ultimately settled the lawsuit.

Lidochem's evidence indicates that Stoller's numerous statements falsely maligned Nutrefol. Green Valley Agriculture sprayed Nutrefol and Foli-Zyme side-by-side on Michigan crops. The two products produced virtually no difference in crop production. LidoChem's insurer, AIG Claim Services, Inc., issued a report on independent laboratory testing of a Nutrefol sample. Although the sample contained two substances that were not listed on the MSDS, neither substance was a threat to soybeans. Additional expert testing of Nutrefol failed to detect 2-PBA at the part-per-trillion level.

LidoChem also produced evidence that it was economically damaged by the false representations. LidoChem's contract with The Andersons provided for an initial one-year term with renewal for successive years unless written notice of termination was given. According to Pucillo, LidoChem's relationship with The Andersons ended after Stoller alleged that Nutrefol contained a toxic substance. Gelder explained that he had to work much harder to sell any LidoChem product in western Michigan, and he produced a list of fifteen Michigan customers and prospects of LidoChem "tainted" by Stoller's actions.

After 2001, Zeeland Farm Services purchased farm chemicals for their customers, including Boersen Farms, exclusively from Stoller Enterprises through Alexander. In 2007, two Michigan farmers approached Christians at Green Valley Agriculture to report that either Stoller or Alexander had informed them that Dean assisted in the development of a new LidoChem product (not Nutrefol) and that the new product would damage their crops.[3]

LidoChem and Dean filed this lawsuit in 2009. Based on expert analysis of sales data for the years 2000 to 2009, LidoChem asserted marketplace damages in the range of $4.4 million to $4.8 million due to an event in 2000 through 2002. In addition, LidoChem alleged additional damages for loss of reputation and ability to compete.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving

---

[3]Although Christians' testimony on this point is hearsay, LidoChem may be able to present admissible evidence on the subject at trial.

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) & (c). The burden to show that there are no genuine issues of material fact falls on the parties seeking summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We consider the evidence in the light most favorable to the non-moving parties, drawing all justifiable inferences in their favor. *Id.* The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law. *Id.* at 251-52.

### III. ANALYSIS

LidoChem and Dean challenge the district court's determination that they failed to produce sufficient proof to present their legal claims to a jury. We conclude that there are genuine issues of material fact with respect to some of the claims against some of the defendants, as explained below.

### A. Lanham Act claim

LidoChem alleged that defendants Stoller, Alexander, Stoller Enterprises, Michael Wright, and McKenzie Wright Laboratories violated the Lanham Act. Section 43(a) of the Lanham Act precludes any person from making any "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. . . ." 15 U.S.C. § 1125(a)(1)(B). This remedial statute is broadly construed

to provide protection against a variety of deceptive commercial practices, including false advertising and promotion. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 (5th Cir. 1996).

The Supreme Court has said that commercial speech is "expression related solely to the economic interests of the speaker and [his] audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980). "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id.* at 561–62. Yet, the "commercial speech" covered by the Lanham Act extends beyond the classic advertising campaign into other forms of promotion used to influence consumers to purchase goods or services. *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995); *Seven-Up Co.*, 86 F.3d at 1384. Speech does not have to resemble a typical advertisement to be commercial. *Semco, Inc.*, 52 F.3d at 112–13 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983)). Thus, to determine what conduct falls within § 1125(a)(1)(B), most courts have held that contested representations must be:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Seven-Up Co.*, 86 F.3d at 1384 (quoting *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994)); *Champion Lab., Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 694 (E.D. Mich. 2009); *Int'l Tech. Consultants, Inc. v. Stewart*, No. 07-13391, 2008 WL 4378095, at *6 (E.D. Mich. Sept. 23, 2008). At a minimum, commercial speech must "target

a class or category of purchasers or potential purchasers, not merely particular individuals."

*Podiatrist Ass'n v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003). A disparaging statement about another's product must be published and must identify some "means through which the defendant disseminated information to a particular class of consumers." *Id.* (citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.102 (4th ed. 2003), and *Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*, 27 F. Supp. 2d 86, 91 (D. Mass. 1998)).

The required level of dissemination to the relevant purchasing public "will vary according to the specifics of the industry." *Seven-Up Co.*, 86 F.3d at 1385–86. The "touchstone" is whether the "contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). Where the market is small and the potential purchasers limited in number, "even a single promotional presentation to an individual purchaser may be enough to trigger the protections" of the Lanham Act. *Seven-Up Co.*, 86 F.3d at 1386; *Mobius Mgt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1019-21 (S.D.N.Y. 1994).

To state a cause of action under § 1125(a)(1)(B) in this Circuit, LidoChem must show:

1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999). The second element allows a plaintiff to establish a Lanham Act

11

violation "without proving actual confusion or a lost sale; that is, a communication that has a 'tendency to deceive'" is enough if all the other elements are met. *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 689 (6th Cir. 2000).

The third element, requiring proof of deception, and the fifth element, requiring proof of injury, are components of causation generally. *Am. Council of Certified Podiatric Physicians and Surgeons*, 185 F.3d at 613. "The deception element asks whether the defendant's misstatements caused the consumer to be deceived." *Id.* This element requires a showing of actual deception or, at the least, a tendency to deceive a substantial portion of the intended audience. *Id.* at 616. A plaintiff may show either that the defendants' statements were literally false or that the statements were true but misleading or confusing. *Id.* at 614. If the plaintiff proves that the statements were literally false, the plaintiff may prevail without evidence that the false statements actually misled consumers because actual deception is presumed. *Id.*; *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335–36 (8th Cir. 1997).

"The injury element asks whether the defendant's deception of the consumer caused harm to the plaintiff." *Am. Council of Certified Podiatric Physicians and Surgeons*, 185 F.3d at 613–14. The "literal falsity" rule may allow a plaintiff to obtain injunctive relief, but it does not assist the plaintiff in recovering "marketplace damages without other proof that such damages occurred." *Balance Dynamics Corp.*, 204 F.3d at 693–94.

Applying these principles, we conclude that Michael Wright and McKenzie Wright Laboratories did not engage in commercial speech by providing Stoller with a false laboratory report because Wright was not engaged in promotion to influence consumers to purchase goods or services

12

from McKenzie Wright Laboratories. *See Semco, Inc.*, 52 F.3d at 112. Similarly, Wright did not engage in commercial speech when he participated as an expert witness in Boersen Farms' lawsuit against LidoChem and others. *See Seven-Up Co.*, 86 F.3d at 1384; *Podiatrist Ass'n*, 332 F.3d at 19; *Fashion Boutique of Short Hills, Inc.*, 314 F.3d at 57. Therefore, Wright and McKenzie Wright Laboratories are entitled to summary judgment on the Lanham Act claim.

Turning to the Lanham Act claim against Stoller Enterprises, we note the parties do not dispute that LidoChem and Stoller Enterprises were commercial competitors during the relevant time frame. Further, Stoller Enterprises may be held vicariously liable for the conduct of its owner, Stoller, and its employee, Alexander. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1277 (10th Cir. 2000) ("Vicarious liability may arise either from an employment or agency relationship.") Therefore, we consider whether LidoChem produced sufficient evidence to proceed to trial on the Lanham Act claim against Stoller Enterprises.

Taking the evidence in a light most favorable to LidoChem, we conclude that a reasonable factfinder could determine that Stoller engaged in commercial speech for the purpose of influencing consumers—not just the end-use farmer, but also the farm-chemical distributor—to buy Stoller Enterprises products and that Stoller's statements were disseminated widely enough to the relevant purchasing public to constitute promotion within the relatively small western-Michigan farm-chemical industry. *See, e.g., Seven-Up Co.*, 86 F.3d at 1384; *Porous Media Corp.*, 173 F.3d at 1121; *Champion Lab., Inc.*, 616 F. Supp. 2d at 694; *Int'l Tech. Consultants, Inc.*, 2008 WL 4378095, at *6. LidoChem produced ample evidence that Stoller repeatedly made false statements of fact about the toxicity of Nutrefol directly to western Michigan farmer Dennis Boersen, as well as to a farm-

chemical distributor in western Michigan, Wally Gerst of Advanced Ag Services. Because Stoller's claim that Nutrefol contained a toxin was demonstrably false, actual deception is presumed and LidoChem is not required to produce proof that Stoller's false statements actually misled consumers. *See Am. Council of Certified Podiatric Physicians and Surgeons*, 185 F.3d at 613; *Porous Media Corp.*, 110 F.3d at 1335–36. Further, Stoller disparaged LidoChem in another way by casting doubt on Dean's honesty and on the validity of his patents. *See Int'l Tech. Consultants, Inc.*, 554 F. Supp. 2d at 757–58 (holding letter to competitor's customer questioning ownership of certain technology was meant to convey that letter writer owned the technology and was more competent and trustworthy to handle a project than the competitor).

LidoChem produced sufficient evidence that Stoller's false statements were material, in that they influenced purchasing decisions by farmers and distributors. After Stoller first alleged in 2001 that Nutrefol contained a substance harmful to plants, LidoChem's Michigan salesman, Gerry Gelder, had difficulty selling the product to distributors. At least one Michigan distributor, Zeeland Farm Services, stopped selling LidoChem's products altogether and instead sold only Stoller Enterprises' products after 2001. Pucillo and Gelder identified a list of customers whose purchasing decisions were influenced by Stoller's false statements.

In addition, Stoller knowingly placed his false statements about LidoChem and Nutrefol into the stream of interstate commerce, and LidoChem produced expert evidence of a causal link between the challenged disparagement and more than four million dollars in damages to LidoChem. Whether the causation analysis is affected by the fact that Nutrecology pulled Nutrefol from the market in late 2001 is a factual question for the jury to decide. We conclude that LidoChem presented sufficient

14

proof on the elements of a Lanham Act claim to warrant a jury trial. *See Am. Council of Certified Podiatric Physicians and Surgeons*, 185 F.3d at 613.

The defendants contend that many of Stoller's comments were directed to the attorney for Boersen Farms and, as such, they were not commercial speech. We disagree. The attorney acted as the agent of Boersen Farms in dealing with Stoller, *see Uniprop, Inc. v. Morganroth*, 678 N.W.2d 638, 640–41 (Mich. Ct. App. 2004), and the evidence suggests that Stoller fully expected his statements to the attorney to reach farmer Dennis Boersen and the farm-chemical industry in western Michigan. A reasonable jury, in examining Stoller's motive for disparaging LidoChem and Nutrefol to Boersen's attorney, could believe Stoller's own words—that he intended to instigate litigation to inflict severe competitive injury on LidoChem and disrupt its business relationships. Stoller even admitted during his deposition in the Boersen Farms lawsuit that he possessed a financial interest in the success of the litigation. The district court's belief that Stoller made the false statements to the attorney simply to promote himself as a consultant and expert may be one reasonable interpretation of the evidence, but it is not the only one, and it is the jury's role to decide which reasonable factual inferences should be drawn from the evidence as a whole.

LidoChem also produced evidence that Alexander directly communicated false information about Nutrefol to Dennis Boersen and other Michigan growers. After McKenzie Wright Laboratory provided Stoller Enterprises with a false report that Nutrefol contained 2-PBA, the substance allegedly toxic to the Boersens' soybean plants, Calvin Hartzog called Alexander and told him, "we got 'em," referring to LidoChem and Dean. Stoller also explained the results of the false lab report to Alexander, who then communicated the results of Wright's lab testing directly to Dennis Boersen.

15

Further, Alexander agreed to be a fact witness for the Boersens and met with their attorney to prepare for the lawsuit Boersen Farms filed against LidoChem, Dean and others. In addition, Alexander agreed to serve as an expert witness for the Boersens on the topic of the investigation into Nutrefol. At the time of the deposition, Boersen Farms was Alexander's largest customer and accounted for twenty-five to thirty percent of his sales of Stoller products. Alexander also admitted that he discussed the facts underlying the Boersens' lawsuit with Michigan growers to whom he sold Stoller products, including the managers of Sackett Ranch and Blue Sky. According to Alexander, the Sacketts were aware that LidoChem and Dean had allegedly added a toxic compound to Nutrefol. A reasonable jury hearing this evidence could find that Alexander communicated false statements about Nutrefol and convinced Michigan farmers to purchase Stoller Enterprises' products instead of LidoChem's.

Finally, LidoChem presented proof that Stoller's and Alexander's statements were material, in that the statements likely influenced the business decisions of The Andersons, LidoChem's distributors, and Michigan farmers with respect to LidoChem products. The statements were made in interstate commerce and not solely to lawyers for Boersen Farms. LidoChem also produced expert evidence to draw a causal link between the challenged conduct in 2001 and damage to LidoChem.

Because there are genuine issues of material fact on LidoChem's Lanham Act claim against Stoller, Alexander, and Stoller Enterprises, we reverse the grant of summary judgment on this claim. We affirm summary judgment in favor of Wright and McKenzie Wright Laboratories on the Lanham Act claim.

16

No. 10-1686
*Lidochem, Inc., et al. v. Stoller Enterprises, Inc., et al.*

The dissent criticizes our decision to reverse the grant of summary judgment in favor of Alexander, asserting that we have no authority to consider facts in the summary judgment record that counsel did not mention specifically to the district court. To the contrary, our power to consider the entire summary judgment record springs from two sources: the Federal Rules of Civil Procedure and Supreme Court case law.

First, Federal Rule of Civil Procedure 56(c)(3) provides: "The court need consider only the cited materials, but it may consider other materials in the record." Thus, while the litigant must cite "particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), courts are not precluded from exercising the discretion granted to them in Rule 56(c)(3) to review other materials in the record. In accordance with the discretion granted by this rule, we reviewed the entirety of defendant Alexander's deposition, which is included in the summary judgment record.

The dissent asserts that appellate courts cannot or should not rely on Rule 56(c)(3) because that rule is to be applied only by district courts. Fed. R. Civ. P. 1. However, our cases are replete with statements that we apply the same Rule 56 standard that was applied by the district court. *See e.g.*, *Alexander v. CareSource*, 576 F.3d 551, 557 (6th Cir. 2009); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003); *E.I. Du Pont de Nemours & Co. v. Okuley*, 344 F.3d 578, 584 (6th Cir. 2003); *Hunley v. DuPont Auto.*, 341 F.3d 491, 495 (6th Cir. 2003); *Dotson v. Wilkinson*, 329 F.3d 463, 466 (6th Cir. 2003); *Thacker v. City of Columbus*, 328 F.3d 244, 251–52 (6th Cir. 2003); *Perry v. McGinnis*, 209 F.3d 597, 600 (6th Cir. 2000).

17

The dissent worries, moreover, that if a plaintiff files a motion to reconsider under Rule 59(e), this court could consider evidence that Rule 59(e) bars the district court from considering. But we have already made clear that we review a Rule 59(e) motion to alter or amend the judgment *de novo*, using the same standard that was applied by the district court, just as we do in the Rule 56 context. *See Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999). And there is no reason to fear, as the dissent does, that if a party *produces no evidence* in response to the summary judgment motion, this court will nonetheless scour the moving party's evidence to find a genuine issue of material fact. We apply the well-settled principle that the non-moving party may not rest on his pleadings, but must produce evidence to show that there is a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Havensure, L.L.C. v. Prudential Ins. Co.*, 595 F.3d 312, 315 (6th Cir. 2010). In any event, this case does not involve a non-moving party's failure to produce evidence in opposition to a summary judgment motion. LidoChem produced Alexander's entire deposition when it filed its summary judgment response.

Further, it is beyond dispute that our examination of a summary judgment ruling is *de novo*. *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010). In conducting such review, the Supreme Court counsels us to review the summary judgment "record taken as a whole." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In accordance with the Supreme Court's guidance, we have conducted "independent review" of the factual record to decide that summary judgment was properly granted, *see e.g.*, *Coffman v. Ford Motor Co.*, 447 F. App'x 691, 697 (6th Cir. 2011); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1097 (6th Cir. 1996), or to decide that reversal of summary judgment was required. *See e.g.*, *Toledo*

No. 10-1686
*Lidochem, Inc., et al. v. Stoller Enterprises, Inc., et al.*

*Elec. Joint Apprenticeship v. Patchen*, 14 F. App'x 601, 603–04 (6th Cir. 2001); *Ferby v. Runyon*, No. 92-5662, 1993 WL 309716, at *6 (6th Cir. Aug. 13, 1993).

Finally, the rule proposed by the dissent is impractical to apply and contrary to the purposes of appellate review. It would bar this court from considering evidence—either contradictory or supportive—found in reviewing the record on points raised and argued by the parties. While our rules and cases may not *require* us to consider that evidence, there is nothing in them that supports the notion that an appellate court must blind itself to germane evidence. Under *de novo* review, we must apply the law to the facts in the record, and the dissent's proposal would necessarily hamstring fulfillment of that duty.

The case law cited and many similar cases we have decided, along with Rule 56(c)(3), supports our determination that the district court's grant of summary judgment to Alexander must be reversed based on Alexander's own deposition testimony. To the extent the dissent relies on cases from other circuits, we are not persuaded to deviate from our own established law.

## B. Tortious-interference claim

LidoChem and Dean also alleged in their complaint that all defendants tortiously interfered with plaintiffs' business interests. To prevail on a claim of tortious interference with a business relationship under Michigan law, a plaintiff must prove: "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *BPS Clinical Labs. v. Blue Cross and Blue Shield of Michigan*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996). "One is liable for

19

commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another." *Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.*, 268 N.W.2d 296, 299 (Mich. Ct. App. 1978) (emphasis omitted). A plaintiff "must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's . . . business relationship." *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984). Tortious interference may be caused by defamatory statements. *Lakeshore Cmty. Hosp., Inc. v. Perry*, 538 N.W.2d 24, 27 (Mich. Ct. App. 1995).

The district court determined that the gravamen of the tortious-interference claim was false statements, but ruled that LidoChem failed to present sufficient proof to warrant a jury trial. We disagree. In light of the evidence summarized above, a jury could reasonably determine that Stoller, Alexander, Stoller Enterprises, Wright, and McKenzie Wright Laboratories tortiously interfered in LidoChem's business relationships with Boersen Farms, Zeeland Farm Services, Gerst, and The Andersons by falsely stating that Nutrefol contained a toxic chemical. The defendants knew of LidoChem's business relationships with these entities. A reasonable jury could find intentional interference by inducing or causing a breach or termination of those business relationships, and LidoChem presented proof of damages. Whether LidoChem had a valid business relationship or a future expectancy of a business relationship with Boersen Farms or The Andersons are factual questions for the jury.

20

We do not see sufficient evidence in the record to warrant trial on any separate claim for tortious interference that Dean may have against the defendants. Therefore, we reverse the grant of summary judgment to the defendants on the tortious-interference claim as to LidoChem, but affirm as to Dean.

## C. Civil conspiracy

LidoChem claims that Stoller, Alexander, Stoller Enterprises, Wright, and McKenzie Wright Laboratories conspired to create a false lab report and then destroyed relevant evidence. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 486 N.W.2d 351, 358 (Mich. Ct. App. 1992).

A jury could rationally find that Stoller, his company, Wright, and McKenzie Wright Laboratories conspired to create the false lab report that became the central evidence that Boersen Farms used to support the lawsuit against LidoChem and its associates. A jury might also determine that Alexander was a co-conspirator because Hartzog notified Alexander of the results of the false lab report and Alexander then communicated the results directly to Dennis Boersen. Alexander also agreed to serve as a fact witness, and perhaps an expert witness, in the Boersen Farms' lawsuit against LidoChem, Dean and others. From all the evidence LidoChem produced, a jury could rationally determine that two or more persons, by concerted action, combined to accomplish the unlawful purpose of engaging in unfair competition under the Lanham Act and other violations of state tort law. We reverse the grant of summary judgment on this claim and remand it for trial.

## D.  Injurious falsehood

LidoChem and Dean allege that all of the defendants are liable for injurious falsehood. Under Michigan law, a person "who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if . . . he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and . . . he knows that the statement is false or acts in reckless disregard of its truth or falsity." *Kollenberg v. Ramirez*, 339 N.W.2d 176, 179 (Mich. Ct. App. 1983) (quotation omitted). "The communication of such an injurious statement to a third party must play a 'material and substantial part in inducing others not to deal with the plaintiff, with the result that the plaintiff suffers special damage, in the form of loss of trade or other dealings.'" *Neshewat v. Salem*, 173 F.3d 357, 363 (6th Cir. 1999) (quoting *Kollenberg*).  The plaintiff must prove that the injurious statement is actually false. *Id.*

The district court ruled that LidoChem's injurious-falsehood claim failed because LidoChem did not prove causation, i.e., that the injurious statements played a material and substantial part in inducing others not to deal with LidoChem.  We think this analysis overlooks the evidence that the defendants' concocted falsehood about Nutrefol did play a material and substantial part in inducing Boersen Farms, Zeeland Farm Services, and The Andersons to refrain from doing further business with LidoChem.  Again, viewing the record in a light favorable to LidoChem, we determine that this claim must also be presented to a jury for resolution.  Because we uncovered no evidence in the record to show that Dean suffered any damages, we agree that summary judgment was proper as to his claim.  To the extent LidoChem alleges that Stoller and Wright committed perjury during their

depositions, however, its claims must fail because witnesses are immune from causes of action based on testimony given during a legal proceeding. *See Briscoe v. LaHue*, 460 U.S. 325, 331–32 (1983). We reverse the grant of summary judgment on the claim of injurious falsehood brought by LidoChem, but affirm on the claim brought by Dean.

## E.  Defamation

The last claim before us is defamation, the elements of which are:  (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation *per se*) or the existence of special harm caused by the publication (defamation *per quod*).  *Sawabini v. Desenberg*, 372 N.W.2d 559, 563 (Mich. Ct. App. 1985).  Dean alleged that Alexander defamed him during a 2008 luncheon meeting with Gelder.  During the meeting, Alexander allegedly "bashed" Dean and Gerst.  Also, at that time, Gelder knew the Boersen Farms litigation had settled.  Alexander allegedly told Gelder that, if he would work for Alexander, then Alexander would reveal to him what "really" happened in the Boersen Farms litigation and Gelder would be shocked.  Gelder did not go to work for Alexander, so he did not learn what "really" happened in the litigation.

This evidence is insufficient to meet the first element of defamation, proof of a false and defamatory statement concerning the plaintiff.  Moreover, as previously stated, Dean did not produce any evidence of his damages.  We conclude that the district court properly granted summary judgment on Dean's defamation claim.

In this appeal, Dean points to Gelder's testimony that Alexander said: "Frank Dean knowingly put materials in fertilizer." Appellants' Br. at 39. Any defamation claim relating to this statement is not properly preserved for our review. In addition, to the extent Gelder did initially so testify, he subsequently retracted the statement and testified that Alexander did not make any such comment to him at the lunch meeting. Therefore, the claim lacks merit and should not proceed.

Finally, a one-year statute of limitations applies to defamation, and any such claim accrues when the defamatory statement is made. *Mitan v. Campbell*, 706 N.W.2d 420, 422 (Mich. 2005). Neither LidoChem nor Dean has pointed to any defamatory statement made by Stoller within the one-year limitations period. Therefore, summary judgment on the defamation cause of action was appropriate.

## IV.  CONCLUSION

For all of the reasons stated, we AFFIRM in part, REVERSE in part, and REMAND for trial. We affirm the grant of summary judgment on all claims brought by Dean individually. We also affirm the grant of summary judgment on LidoChem's Lanham Act claim against Wright and McKenzie Wright Laboratories, as well as LidoChem's defamation claim. We reverse the grant of summary judgment on LidoChem's claim under the Lanham Act against Stoller, Alexander, and Stoller Enterprises, and we reverse the grant of summary judgment on LidoChem's claims against Stoller, Alexander, Stoller Enterprises, Wright, and McKenzie Wright Laboratories for tortious interference, injurious falsehood, and civil conspiracy.

No. 10-1686
*Lidochem, Inc., et al. v. Stoller Enterprises, Inc., et al.*

**THAPAR, District Judge, dissenting in part.** After reviewing the record, the briefs, and the law, a well-prepared district judge asked direct and pointed questions at a summary-judgment hearing. He wanted to know what evidence the plaintiffs had to support three of their claims against Dave Alexander. The plaintiffs came up with nothing more than rumors and speculation–not a scintilla of concrete evidence. So the district court did the only thing it could by properly granting Alexander's motion for summary judgment on those claims.

The story should end there. But in this case, the majority, acting alone, finds evidence that purportedly supports the plaintiff's arguments. When was that evidence first presented? Not in the briefs to the district court. Not in the argument before the district court. Not in response to the district court's questions. And not in this court. Never.

After finding those never-presented facts, the majority uses those facts as the sole grounds for reversing the district court's grant of summary judgment on the Lanham Act, injurious-falsehood, and tortious-interference claims against Alexander. To recall, LidoChem and Dean allege that some of their competitors in the agricultural fertilizer industry, Stoller and Alexander, made literally false statements about LidoChem's and Dean's products that caused them to lose business. LidoChem and Dean sued these defendants, asserting Lanham Act, injurious-falsehood, tortious-interference, civil conspiracy, and defamation claims. Stoller and Alexander moved for summary judgment, arguing in part that there was no admissible evidence that they made any actionable statements. To avoid summary judgment on the Lanham Act, injurious-falsehood, and tortious-interference claims against Alexander, LidoChem and Dean only pointed to the rumor-and-guesswork mill:

25

- Christian's testimony that his two farmers told him that Alexander said LidoChem products would damage any crops they tried to grow. Pls. Resp. in Opp., R. 70 at 21 (citing Christian Dep., R. 70-11 at 68–69).

- Gelder's testimony that individuals, including Pete VanWeerdhuizen, Keith Hanenberg, and Steve Leiprandt, told him that Alexander said LidoChem's products were having "quality issues" and contained "poison." *Id.* (citing Gelder Dep., R. 70-10 at 99–105).

- Gerst's testimony that Gelder, Green Valley, and farmer Adam Mulder told him that Alexander said negative things about Dean's and LidoChem's products. *Id*. at 32 (citing Gerst Dep., R. 70-17 at 120–22, 146).

- Alexander must have said something false about LidoChem during his meeting with Rod Enry, the President of The Andersons. Mots. Hr'g Tr., R. 75 at 9–10.

The district court correctly concluded that none of this evidence was sufficient to defeat summary judgment. After all, Christian, Gelder, and Gerst each testified that "Farmer X [told him] about what somebody else said to Farmer X." Mots. Hr'g Tr., R. 75 at 66. That inadmissible hearsay is not competent summary judgment evidence. *See, e.g.*, *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) ("If the [offered evidence] is deemed to be hearsay, then the evidence could not be considered on summary judgment."). And LidoChem and Dean did not present any evidence that Alexander made a negative statement—let alone a literally false statement—about them during the meeting with Enry. Worse yet, when the district court specifically inquired about the contents of the statements, counsel inexplicably responded that they did not depose the individuals at The Andersons

26

because those individuals were dismissed from the case. R. 75 at 10. On appeal, all the plaintiffs can do is point to the meeting between Alexander and Enry and speculate that the timing was right for something to have been said. Appellant's Br. at 9. Pointed to these—and only these—facts, the district court properly granted summary judgment on all the claims against Alexander. What else was the district court to do?

According to the majority, roll up its judicial sleeves and scour the record for evidence to avoid granting summary judgment. The majority sifts through hundreds of pages of deposition testimony to find two false representations made by Alexander: Alexander admitted that he explained the results of the false McKenzie Wright Laboratory report directly to Dennis Boersen. *See* Alexander Dep., R. 70-18 at 119, 145. And he also admitted that he discussed the facts underlying the Boersens' lawsuit with Michigan growers, including managers of Sackett Ranch and Blue Sky. *See id.* at 174–75. Majority Op. at 15–16. This set of statements, the majority concludes, is a sufficient basis for the plaintiffs' claims against Alexander to survive summary judgment.

The majority does not dispute that these statements were neither presented to the district court nor on appeal. So where does the majority claim authority to start combing the record? They say Federal Rule of Civil Procedure 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). There are multiple problems with the court of appeals applying Rule 56(c)(3). For starters, the rule applies to district courts, not appellate courts, *see* Fed. R. Civ. P. 1 (noting rules apply to district courts), and it is discretionary, not mandatory, *see* Fed. R. Civ. P. 56(c)(3) (stating that the district court "may" consider other materials). But the majority says that *de novo* review justifies the appellate court starting over. *De novo* review though

27

has never meant the appellate court starts over.  Rather, it means the appellate court takes the facts as presented to the court below and reviews whether summary judgment is justified without giving special deference to the decision below.  *See, e.g.*, *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007) (stating on summary judgment review that Sixth Circuit looks at factual record as presented by the non-movant to district court); 1 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 2.14 (3d ed. 1999) ("[W]hat is meant [by de novo review] is merely appellate power, ability, and competency to come to a different conclusion *on the record as determined below*.") (emphasis added).

Maybe the majority's misunderstanding of the rules stems from the word "presented" or "record below."  After all, the record below arguably includes everything, and all of that is in some sense "presented" to the district court.  But "presented" is a legal term of art that means "pointed out to a court," not simply included in the record.  The Federal Rules of Civil Procedure require a party seeking summary judgment to "present evidence" by pointing to specific facts that demonstrate there is no support for the non-movant's case.  *See Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2005) ("A moving party can meet its burden under Rule 56(c) by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." (internal quotations and citations omitted)). In response, the non-movant must point to specific facts showing there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1)(A); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 n.17 (6th Cir. 1990) (stating non-movant must present affirmative evidence to defeat summary judgment and collecting numerous cases saying the same).  Courts do not engage in a self-directed inquiry into the facts because district judges are not "pigs, hunting for

truffles." *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). And this circuit has reaffirmed this principle time and again. *Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010) (stating that parties may not simply dump "a pile of paper on the district judge's desk," but rather have an obligation "to point to the evidence with specificity and particularity").

Set aside doctrine for a minute and imagine a world where appellate courts could apply Rule 56(c)(3) when they saw fit. After the parties fail to demonstrate a disputed issue of fact and the district judge properly grants summary judgment, the court of appeals could go hunting for evidence. But if this sort of review is in the purview of the appellate court, the non-movant can simply file a two-page brief or one with no citations to the record or admissible evidence, and then when they lose, they can rely on the court of appeals to do their job. If that is the standard, why have briefs at all – one side could say, "I move for summary judgment," and the other could say, "We contest," and then the district court judge would have to go hunting through the record. Where does it stop?

And if that is not enough, imagine what the majority's approach does to other rules. Say in this case, after the district court's ruling, the plaintiff files a motion to reconsider under Rule 59(e) and points the court to evidence it forgot to mention before. For a district court to consider that evidence, it must be "previously unavailable." *See GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (holding that for a party to prevail on newly discovered evidence, it "must have been previously unavailable"). Yet, under the majority's reasoning, the appellate court could consider the very evidence that the district court was not allowed to consider. Or let's say the party produces no evidence in response to the movant's factual assertions, and the district court

considers the fact undisputed under Rule 56(e)(2), which allows a district court to consider undisputed facts as proven. Can a court of appeals say, "Well it is *de novo* review and we found facts in the record you could have used to dispute it," and reverse the district court?

Finally, and perhaps most importantly, the majority's voyage into uncharted waters is in contradiction to published circuit precedent on two levels: (1) it ignores the well-established rule that district courts need not examine every line of the record looking for reasons to deny summary judgment, and (2) it ignores the rule that this court will not consider evidence not presented to the district court.

A sampling of cites supporting (1): *Wimbush*, 619 F.3d at 639 n.4 ("This evidence was not attached to her brief responding to Wyeth's merits argument, nor was it cross-referenced in that brief. Instead, Buchanan suggests that the fact that the evidence was in the record somewhere is sufficient to create a question of fact and survive summary judgment. This is simply incorrect."); *Chicago Title*, 487 F.3d at 995 ("A district court is not required to search the entire record to establish that it is bereft of a genuine issue of material fact." (internal quotations and citations omitted)); In re *Morris*, 260 F.3d 654, 654–55 (6th Cir. 2001) ("Poss [argues] that the court used an improper standard that did not require it to review the entire record. . . . The bankruptcy court interpreted *Street* to mean that the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. This reading accords with the burden *Celotex* places on the nonmoving party." (internal quotation omitted)); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) ("Appellants' argument that the district court erred in not searching the record sua sponte is wholly

without merit. The facts presented and designated by the moving party were the facts at hand to be dealt with by the trial court. Furthermore, their status as "the facts at hand" is maintained intact here on review."); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial.").

A sampling of cites supporting (2): *Chicago Title*, 487 F.3d at 995 ("[T]he Sixth Circuit will not entertain on appeal factual recitations not presented to the district court when reviewing a district court's decision. In reviewing summary judgment, we look at the record in the same fashion as the district court." (internal quotations and citations omitted)); *Estate of Mills v. Trizec Props.*, 965 F.2d 113, 115 (6th Cir. 1992) ("In reviewing summary judgment, we look at record in the same fashion as the district court."); *Guarino*, 980 F.2d at 404 ("This Court will not entertain on appeal factual recitations not presented to the district court any more readily than it will tolerate attempts to enlarge the record itself."); *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) (stating that this Court only reviews "the case presented to the district court rather than a better case fashioned after the district court's order" (internal quotation marks and citation omitted)).

Finally, some other circuits' views: *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007) ("[T]he district court is not obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim, rather the nonmoving party must designate the specific genuine issues of material fact that preclude summary judgment. Even though on appeal

Holland designated the specific facts supporting [the claim], Holland waived this argument by not presenting it to the district court." (internal citation and quotation omitted)); *Atlanta Gas Light Co. v. UGI Util., Inc.*, 463 F.3d 1201, 1208 n.11 (11th Cir. 2006) ("Neither the district court nor this court has an obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention."); *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 610 (7th Cir. 2005) ("The appellate stage is too late to specify portions of the record which may create an issue of material fact." (internal quotation omitted)); *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2nd Cir. 2002) ("[Rule 56] does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (noting that "requiring the district court to search the entire record, even though the adverse party's response does not set out the specific facts or disclose where in the record the evidence for them can be found, is unfair" to the movant, to the court, and to other litigants whose cases the court could be addressing); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("Thus, where the burden to present such specific facts by reference to exhibits and the existing record was not adequately met below, we will not reverse a district court for failing to uncover them itself. . . . If the rule were otherwise, the workload of the district courts would be insurmountable and summary judgment would rarely be granted."); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 (5th Cir. 1992) ("Because the Skotaks failed to refer to [certain evidence] in their summary judgment response, the articles were not properly before that court in deciding whether to grant the motion; therefore, they will not be considered here. Although on summary judgment the record is reviewed de novo, this court, for

32

obvious reasons, will not consider evidence or arguments that were not presented to the district court for its consideration in ruling on the motion.").

Even the cases the majority cites are contradictory to their holding. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ("[T]he non-moving party must come forward with specific facts showing there is a *genuine issue for trial*.") (emphasis in original; quotation omitted)); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996) ("The trial court no longer has the duty to search the entire record or establish that it is bereft of a genuine issue of material fact." (quotation omitted)).

In the end, LidoChem and Dean's attorneys did not present the majority's unearthed statements to the district court or in any of their appellate briefs. *See, e.g.*, Appellants' Br. at 16, 29, 36; Appellants' Reply Br. at 4, 12. It was their job to do so, and their failure should be fatal. *Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008) ("It is not the district court's (or our) duty to search through the record to develop a party's claims; the litigant must direct the court to evidence in support of its arguments before the court."). Thus, I respectfully dissent from the reversal of the district court on the Alexander claims.