RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LINDA GRUBBS; TRI-SERVE, LTD.; TRI-SERVE #1, LLC; CAPITAL CONCEPTS, INC.,

        *Plaintiffs-Appellants*,

    *v.*

SHEAKLEY GROUP, INC., et al.,

        *Defendants-Appellees*.

No. 15-3302

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:13-cv-00246—Susan J. Dlott, District Judge.

Argued: October 6, 2015

Decided and Filed: December 7, 2015

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Robert A. Winter, Jr., Fort Mitchell, Kentucky, for Appellants. Rachael A. Rowe, KEATING MUETHING & KLEKAMP PPL, Cincinnati, Ohio, for Sheakley Appellees. **ON BRIEF:** Robert A. Winter, Jr., Fort Mitchell, Kentucky, for Appellants. Rachael A. Rowe, James E. Burke, Thomas F. Hankinson, Anthony M. Verticchio, KEATING MUETHING & KLEKAMP PPL, Cincinnati, Ohio, for Sheakley Appellees. James Papakirk, FLAGEL & PAPAKIRK, LLC, Cincinnati, Ohio, for Appellee First Financial Bank. Angela Strunk Zwick, Hamilton, Ohio, pro se.

---

**OPINION**

---

CLAY, Circuit Judge.  Plaintiffs Linda Grubbs and the companies she owns, Tri-Serve, Ltd.; TriServe #1, LLC; and Capital Concepts, Inc., appeal the order of the district court dismissing Plaintiffs' claims under the Lanham Act, 15 U.S.C. § 1125, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, for failure to state a claim, and dismissing all remaining state law claims over which the district court had pendent jurisdiction.  For the reasons that follow, we **AFFIRM** in part, and **REVERSE** in part, the order of the district court, and remand for further proceedings consistent with this opinion.

**BACKGROUND**

Plaintiff Linda Grubbs is the owner of Plaintiff Capital Concepts, Inc., a financial planning, wealth management, and tax preparation firm providing, among other things, 401(k) planning.  At all relevant times, she was also the owner of Plaintiffs Tri-Serve, Ltd. and TriServe #1, LLC ("Tri-Serve"), the successors to four professional employment organizations ("PEOs") she purchased on October 13, 2008.  A PEO is a type of Ohio regulated entity to which employers may outsource certain administrative tasks, such as payroll, workers' compensation, and benefits.  PEOs serve as co-employers with their clients and are contractually responsible for those functions outsourced to them.  Tri-Serve is based in Harrison, Ohio and provides PEO services to the greater Cincinnati, Ohio market.  It is unclear from the record whether Tri-Serve had any clients outside of Ohio.  After the purchase of Tri-Serve, Grubbs asked Defendant Angelia Strunk-Zwick to manage the newly acquired companies because of her expertise with PEOs.  During her employment with Tri-Serve, Strunk-Zwick was subject to a non-competition agreement.

Defendant Larry Sheakley owns and operates the Sheakley Group of Companies, comprising at least fifteen entities, all named as defendants.  According to their own marketing material, the Sheakley Group of Companies (collectively, "Sheakley") also provide "401(k)

services, flexible benefit plans, workers' compensation, payroll, [and] human resources outsourcing solutions." Sheakley is headquartered in Cincinnati, Ohio.

On February 25, 2009, the President of Defendant Sheakley HR Solutions e-mailed Strunk-Zwick to ask for her assistance with Sheakley's PEO division. During March and April 2009, Strunk-Zwick was paid by Sheakley on a consulting basis, and was sometimes absent from the Tri-Serve office during business hours in order to provide services to Sheakley. On May 27, 2009, Strunk-Zwick met with employees of Sheakley to discuss moving Tri-Serve and its clients to Sheakley. At a follow-up meeting on June 2, 2009, Defendant Larry Sheakley agreed that Strunk-Zwick and two other Tri-Serve staff members would join Sheakley. Over the next several weeks, Strunk-Zwick and various Sheakley employees planned and coordinated the transfer of the Tri-Serve clients to Sheakley via e-mail and phone. Defendant Steve Wolf, acting senior vice-president for Sheakley HR, LLC, suggested in an e-mail on June 21, 2009 to Strunk-Zwick that she contact the Tri-Serve clients to inform them that "we are partnering with Sheakley and that we may transition them over to give them better service etc." (R. 87, Compl. ¶ 971(h), Page ID 3221.) Strunk-Zwick's first day at Sheakley was to be July 6, 2009.

On July 2, 2009, Strunk-Zwick sent an e-mail to a potential client stating, "[W]e will be moving our offices over the weekend, so on Monday, my direct dial number will be 513.728.xxxx and my email will be astrunk@sheakleyhr.com." (*Id.* ¶ 967(ba), Page ID 3215.) The following day, Strunk-Zwick sent another e-mail to twenty-two Tri-Serve clients:

> Customers:
>
> We are moving! In order to better serve you, we are partnering with Sheakley HR and moving our offices. As many of you know, we have partnered with Sheakley over the years with regards to our workers compensation and unemployment management. We have been blessed to have experienced tremendous growth over the last 6 months. We find ourselves needing more office space and more resources to ensure that our customer service level continues to meet your expectations. By moving into Sheakley Group we will be able to provide you and your employees with additional resources, services, and benefits, while continuing to provide you with the service that you have grown accustomed to expect from TriServe. Nothing will change from your standpoint. We will have new contact information, but nothing else will change. You will begin to see the Sheakley HR name and we will be introducing new benefits and new services to assist you with growing your business. Our focus has always been and will continue to be assisting you, the small business owner, with Rediscovering Your Passion. We

appreciate your business over the years and look forward to continuing a long, beneficial relationship with you and your employees.  As always, if you have any questions or concerns please feel free to call me.

Effective Monday, July 6, 2009 our Contact Information will be:

TriServe LTD c/o Sheakley HR Solutions

One Sheakley Way

Cincinnati, OH 45246

513-728-xxxx P

513-672-xxxx F

Payroll Time Submission via web: www.triservehr.com

Payroll Time Submission via fax: 513-672-xxxx

Payroll Time Submission via email: sfernbach@sheakleyhr.com

Angie Strunk Direct Dial: 513-728-xxxx

Email: astrunk@sheakleyhr.com

Susan Fernbach Direct Dial: 513-728-xxxx

Email: sfernbach@sheakleyhr.com

Kym Martin Direct Dial: 513-728-xxxx

Email: kmartin@sheakleyhr.com

Thanks,

Angie Strunk

(R. 87, Compl. ¶ 840, Page ID 3185–86.)  That same day, she mailed a hard copy of the e-mail to most of the same clients.  Several Tri-Serve clients expressed dissatisfaction with the move, were upset that they had received no notice, and worried that all of their information had been transferred to Sheakley.  On July 5, 2009, Strunk-Zwick sent notice of her resignation from Capital Concepts by e-mail to Grubbs.  Before leaving the Capital Concepts office, Strunk-Zwick removed all files, including all customer files, and deleted computer files and e-mails. She also took Tri-Serve's tax returns for 2009.  Sheakley continued to use the Tri-Serve name thereafter, including in promotional materials.

For the next several months, Grubbs had sporadic contact with Strunk-Zwick and Sheakley as they tried to work out various issues with payroll, taxes, and similar matters for 2009. By August 2009, health insurers and workers' compensation departments were still sending third-quarter invoices to Tri-Serve at Grubbs' office, but Sheakley, not Grubbs, received the client payments. From August 26–28, 2009, Grubbs communicated at length with Defendant Tom Pappas, a Sheakley employee, via e-mail regarding the location of various Tri-Serve files, including Tri-Serve's own tax documents. On August 30, Strunk-Zwick stated, in an e-mail to Pappas to be forwarded to Grubbs, that she did not have the tax records in question. Through at least November 2009, Ms. Grubbs continued receiving bills for Tri-Serve, which she paid from her retirement account.

On April 15, 2013, Plaintiffs filed a complaint in the United States District Court for the Southern District of Ohio against Strunk-Zwick, some fifteen Sheakley entities ("the Sheakley Entity Defendants"), several other former Sheakley employees (collectively, the "Sheakley Defendants," a term Plaintiffs use to denote both the entities and the employees).[1] Plaintiffs twice amended their complaint, adding additional defendants not before this Court.[2] The nineteen-count complaint, some 1,018 paragraphs long, contained four claims arising under federal law: trade name infringement and false designation of origin (against the Sheakley Entity Defendants); false advertising (against the Sheakley Entity Defendants and Strunk-Zwick); and substantive RICO and RICO conspiracy claims (against all Sheakley Defendants and Strunk-Zwick). It also asserted fifteen additional state law claims over which it requested the court exercise pendent jurisdiction.

The Sheakley Defendants, Strunk-Zwick, and other defendants moved separately to dismiss for failure to state a claim. The case was referred to a magistrate judge, who issued a

---

[1]Various individual employees of Sheakley are also named as defendants in this litigation. The "Sheakley Defendants" consist of: Sheakley Group, Inc.; Sheakley Benefit Plans Agency, Inc.; Sheakley HR, LLC, Sheakley Medical Management Resources, Inc.; Sheakley Enterprises, Inc.; Sheakley Resolution Systems, LLC; Matt Sheakley; Steve Wolf; Bryan Bundy; Maureen Surkamp; Ken Weber; Susan Fernbach; Kimberly Martin; Heather Fair; Thomas E. Pappas, Jr.; Sheakley-Uniservice, Inc.; Sheakley Unicomp, Inc.; Sheakley HR I, LLC; Sheakley HR II, LLC; Sheakley HR III, LLC; Sheakley HR IV, LLC; Sheakley HR NG, LLC; Sheakley Retirement Plans, LLC; Pay Systems of America, Inc.; Sheakley Retirement Plans, LLC; FBT Ohio, Inc.; and Larry Sheakley.

[2]Also named in the final version of the complaint were James Allen; Frost Todd Brown, LLC; and U.S. Bancorp, who did not file briefs in this appeal. Defendant First Financial Bank filed a short brief urging dismissal of pendent state law claims.

Report and Recommendation recommending that the false designation of origin, false advertising, and RICO claims be dismissed and that the district court dismiss the remaining state-law claims. The district court adopted the Report and Recommendation without changes and entered an order dismissing the Lanham Act claims and the RICO claims for failure to state a claim. The remaining state-law claims were dismissed without prejudice. Plaintiffs now appeal.

## DISCUSSION

### Standard of review

We review *de novo* the grant of a motion to dismiss for failure to state a claim. *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012). In reviewing a motion to dismiss, we are obliged to "accept all factual allegations as true," construing the complaint "in the light most favorable to the plaintiff." *Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 403 (6th Cir. 2014). To survive a motion to dismiss, plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To do so, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### Analysis

**I.      False designation of origin**

Plaintiffs bring a claim for improper use of trade name and false designation of origin under the Lanham Act against the Sheakley Entity Defendants on the basis of the e-mails and mailings Strunk-Zwick sent to Tri-Serve clients.

The Lanham Act provides, in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another

person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Plaintiffs contend that Strunk-Zwick was effectively in the service of Sheakley and seek to impute her conduct to the Sheakley Entity Defendants. Because Plaintiffs bring this claim only against the Sheakley Entity Defendants, we must address the issue of whether Defendants may be held vicariously liable for the conduct of Strunk-Zwick.

## A.      Vicarious liability under the Lanham Act

This Circuit allows plaintiffs to hold defendants vicariously liable for trademark infringement under the Lanham Act when the defendant and the infringer have an actual or apparent partnership, have authority to bind one another in transactions, or exercise joint ownership or control over the infringing product. *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (adopting test of Fourth and Seventh Circuits articulated in *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 165 (4th Cir. 2012), and *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992)). While *Coach* involved a claim for trademark infringement under a different section of the Lanham Act, the Ninth Circuit, which also uses this test, has extended it to false designation of origin claims brought under 15 U.S.C. § 1125(a). *See Routt v. Amazon.com, Inc.*, 584 F. App'x 713, 716 (9th Cir. 2014) (quoting *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007) (employing *Hard Rock Cafe* test for false designation of origin claims)). We therefore use that test here.

Plaintiffs contend that they have stated a claim based on the text of the e-mail Strunk-Zwick sent to twenty-two clients. The e-mail explicitly refers to the relationship of Tri-Serve and Sheakley as a partnership: "We are partnering with Sheakley HR and moving our offices. As many of you know, we have partnered with Sheakley over the years with regards to our workers compensation and unemployment management." (R. 87, Compl. ¶ 840, Page ID 3185.) Strunk-Zwick apparently used the language about "partnering" at the suggestion of Defendant Larry Wolf, who suggested in an e-mail to Strunk-Zwick on June 21, 2009 that she contact Tri-Serve clients to inform them that "we are partnering with Sheakley and that we may transition them over to give them better service etc." (*Id.* ¶ 971(h), Page ID 3221.) The intent to create an

apparent partnership in the eyes of the Tri-Serve clients is self-evident from this language, and we therefore proceed to the merits of the claim for improper use of trade name and false designation of origin brought against the Sheakley Entity Defendants.

### B.      Use in a "trademark way"

In some cases, a threshold question exists as to whether the challenged use of a trademark identifies the source of goods; if not, that use is in a "non-trademark way" outside the protections of trademark law. *Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003). This finding may be dispositive: plaintiffs cannot succeed on a trademark claim where trademark law does not apply. If, however, a plaintiff shows that a defendant is "'using the challenged mark in a way that identifies the source of their goods,'" which we consider use in a trademark way, we proceed to the remainder of our analysis. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) (citation omitted).

The district court held that the e-mail and flyer used Tri-Serve's mark in a non-trademark way "as a source of comparison between the two organizations," and ended its analysis there. *Grubbs v. Sheakley Grp.*, No. 1:13cv246, 2015 WL 1321126, at *6 (S.D. Ohio Mar. 18, 2015). Relying on *Hensley*, the Sheakley Defendants ask us to affirm the district court's ruling that Strunk-Zwick used the Tri-Serve name in the e-mails in a non-trademark way. *See* 579 F.3d at 611. Plaintiffs contend that Strunk-Zwick used the Tri-Serve name in a trademark way in the e-mails and mailings, and that Defendants' reliance on *Hensley* is mistaken. They urge us instead to follow *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998), in which we affirmed a grant of summary judgment to the plaintiff on a false designation of origin claim where an architect had erased another architect's name and mark on a set of plans and replaced them with his own.

*Hensley* concerned an inventor of RV hitches, Jim Hensley, who had left the company bearing his name, Hensley Manufacturing, and licensed a new design to Hensley Manufacturing's rival, ProPride, Inc. 579 F.3d at 607. Hensley Manufacturing owned the trademark to "Hensley." *Id.* at 606. ProPride's promotional material mentioned Jim Hensley's history of designing hitches and that he had designed a new hitch, the 3P Hitch, for ProPride. *Id.* at 608. Three pieces of promotional material contained a disclaimer that Jim Hensley was no longer affiliated with Hensley Manufacturing; another described his history at Hensley

Manufacturing and then with ProPride. *Id.* at 607–08. *Hensley* affirmed the district court's dismissal for failure to state a claim, holding that ProPride was clearly the source of the 3P Hitch, and that ProPride's use of "Hensley" always in the context of the inventor's full name, Jim Hensley, was not used in a trademark way and therefore created no likelihood of consumer confusion as to the source of the product. *Id.* at 611.

We believe that the Sheakley Defendants' reliance on *Hensley* is misplaced, and that the court below erred in holding that the e-mail and flyer used the Tri-Serve name in a non-trademark way. The e-mail to existing Tri-Serve clients, which provided a new address of TriServe LTD c/o Sheakley HR Solutions at One Sheakley Way, thus designated the geographic source of the PEO services—and implied that those services would be originating from both Tri-Serve and Sheakley HR. The payroll submission link to www.triservehr.com suggested that Tri-Serve would still be the source of payroll services, as before. This Circuit has held for years that domain names, such as www.triservehr.com, "can and do communicate information as to the source or sponsor of the web site." *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 250 (6th Cir. 2003), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125 (2004). Thus, we consider Strunk-Zwick to have used the Tri-Serve name in a trademark way.

### C.     Likelihood of confusion

Because the e-mails and mailings used the Tri-Serve name in a trademark way, we must now evaluate whether the plaintiff has "allege[d] facts establishing that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." *Hensley*, 579 F.3d at 609; *see also Johnson*, 149 F.3d at 502 ("(1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion"). "Whether a likelihood of confusion exists is a mixed question of law and fact subject to *de novo* review." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007). The parties do not dispute Plaintiff's ownership of the Tri-Serve name, or Strunk-Zwick's use of the Tri-Serve name in commerce. They do, however, dispute whether the use of the Tri-Serve name created a likelihood of confusion.

Eight factors guide our analysis in determining whether a likelihood of confusion exists: "(1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing of channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark." *Audi AG v. D'Amato*, 469 F.3d 534, 542–43 (6th Cir. 2006) (citation omitted) (noting that these factors are common to our analysis of trademark infringement, unfair competition, and false designation of origin claims). We recognize that "[e]ach case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). In a few cases, such as *Johnson v. Jones*, we have eschewed this analysis. 149 F.3d at 503 (where a defendant placed his own mark on "plaintiff's product and has represented it to be his own work" we deemed it "difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion"). Nevertheless, the "ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Grp.*, 931 F.2d at 1107. Keeping in mind the importance of a "thorough and analytical treatment," *id.*, we turn to the eight factors.

### 1.　　　　Strength of the senior mark

"[T]he strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore the more protection it is due." *Audi*, 469 F.3d at 543. "A mark is 'strong and distinctive when the public readily accepts it as the hallmark of a particular source;' such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir.1985)). Marks fall on a "spectrum" that ranges, in order of increasing strength, from "(1) generic or common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116–17 (6th Cir. 1996) (quoting *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984)). The Tri-Serve name fits best into the category of suggestive marks, which

"suggest[] rather than describe[] an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Id.* at 1117. The Tri-Serve name suggests attentive customer service, possibly in the tri-state area that comprises greater Cincinnati, Ohio; as a suggestive mark, it falls toward the stronger end of the spectrum we have devised. Plaintiffs do not allege that the Tri-Serve name was known to the public at large in the Cincinnati area or nationally; however, Tri-Serve customers were perfectly acquainted with the name.

### 2. Relatedness of the goods or services

We next look to whether Plaintiffs' and Defendants' goods or services are related. We have developed three analytic categories for Lanham Act cases such as this one: "[f]irst, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely. *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003). The object of this inquiry is to "focus[] on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 797 (6th Cir. 2004) (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002)). While we note that this factor is best suited to cases involving two distinct but similar marks, the facts of this case fit most neatly into the first of these three categories. Both Sheakley and and Tri-Serve were in the PEO business, and Strunk-Zwick brought Tri-Serve's clients to a competitor business by using the Tri-Serve name in her e-mails to tell clients that their business was moving to Sheakley. As discussed further below, the purpose of this e-mail was to lead the Tri-Serve customers to believe that Tri-Serve was indeed partnering with Sheakley. Thus, this factor weighs strongly in favor of potential consumer confusion.

### 3. Similarity of the marks

Unlike many Lanham Act cases, this case involves not two similar but distinct marks, but a defendant who has adopted Plaintiffs' mark wholesale. In her e-mail of July 3, 2009, Strunk-

Zwick used the Tri-Serve name when identifying the new address as "TriServe LTD c/o Sheakley HR Solutions" and www.triservehr.com as the site for payroll time submission.[3] In cases where, as here, a defendant has taken a plaintiff's "actual trademark," this factor supports a finding of consumer confusion. *See Audi*, 469 F.3d at 543.

### 4.      Evidence of actual confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *AutoZone*, 373 F.3d at 798 (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir.1988)). Several Tri-Serve clients apparently expressed dissatisfaction with the move, were upset that they had received no notice, and worried that all their information had been transferred to Sheakley. Moreover, because the Tri-Serve clients started sending their payments to Sheakley by August at the latest, they appear to have been duped by the e-mail.

### 5.      Marketing channels used

This factor requires us to consider "how and to whom the respective goods or services of the parties are sold." *Homeowners Grp.*, 931 F.2d at 1110. In essence, this part of the test asks us to evaluate the similarity in the customers for the goods and services as well as in the "marketing efforts" employed by each party. *See Wynn Oil*, 839 F.2d at 1188. While Plaintiffs do not make any refer to the marketing approaches of either Tri-Serve or Sheakley beyond passing references to promotional material, their potential customer base was the same: small businesses in greater Cincinnati seeking PEO services. The move of some twenty-three clients from Tri-Serve to Sheakley further supports the overlap in customer base.

### 6.      Degree of customer care

The degree of customer care—*i.e.*, how carefully a consumer selects a particular good or service—may also affect the possibility of consumer confusion. In most cases, customers are held to the standard of a "typical buyer exercising ordinary caution"; confusion is less likely in cases involving expensive or unusual services or unusually skilled buyers. *Homeowners Grp.*,

---

[3]Plaintiffs spell the name of "Tri-Serve, Ltd." with a hyphen in the Complaint, but we do not believe that the lack of a hyphen rendered the use of the Tri-Serve name anything other than misleading to its existing customers. We have held that where "differences in lettering and hyphenating are very slight," they are "likely to cause confusion." *Induct-O-Matic*, 747 F.2d at 361.

931 F.2d at 1111. There is no evidence that business owners purchasing HR services from Tri-Serve or Sheakley should be held to this higher standard. The question for our ultimate analysis, then, is whether a typical buyer exercising ordinary caution receiving Strunk-Zwick's e-mail could be confused as whether the HR services were coming from Sheakley or Tri-Serve.

### 7.          The intent of defendant in selecting the mark

We have held that "[i]f a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *AutoZone*, 373 F.3d at 799 (quoting *Homeowners Grp.,* 931 F.2d at 1111). Moreover, where the copying is deliberate, even if the intent to confuse is not, "purposeful copying indicates that the alleged infringer. . . believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores,* 109 F.3d at 286 (citing *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987)). There is no doubt that the use of the Tri-Serve name in the e-mail was intentional: Strunk-Zwick and Sheakley employees planned the move of the Tri-Serve clients to Sheakley over the course of weeks. A Sheakley employee suggested the language about "partnering" to Strunk-Zwick. The use of the Tri-Serve name cannot have been anything other than purposeful; we therefore read Strunk-Zwick's e-mail as calculated to mislead the Tri-Serve clients into diverting their business to Sheakley.

### 8.          Likelihood of expansion of the product lines

The possibility that a product line will be expanded weighs in favor of a finding of infringement. *Homeowners Grp.*, 931 F.2d at 1112. Because Plaintiffs do not appear to intend to expand their product lines, this factor is not relevant to our analysis.

The relevant factors all point toward a finding of likely consumer confusion. We further recall that the ultimate inquiry is "whether relevant consumers are likely to believe that the products or services offered by the parties are *affiliated* in some way." *Daddy's Junky Music Stores*, 109 F.3d at 280 (quoting *Homeowners Grp.*, 931 F.2d at 1107) (emphasis added); *see also* 15 U.S.C. 1125 (a)(1)(A) (imposing liability where defendants confuse or deceive consumers into believing goods or services are affiliated). The July 3, 2009 e-mail and mailing to customers stated that "we are partnering with Sheakley HR," and that they were "moving into

Sheakley Group." Taking the facts in the light most favorable to Plaintiffs, as we must, we read the frequent use of the first person plural throughout the e-mail to mean Tri-Serve, not simply Strunk-Zwick and the other Tri-Serve staff members who were entering Sheakley's employ; according to the e-mail, all of Tri-Serve was moving, and was partnering with Sheakley. The text of the e-mail is full of ambiguous references to the source of the PEO services: an address of "TriServe LTD c/o Sheakley HR Solutions" at One Sheakley Way; a payroll URL at triservehr.com; and e-mail contact information at sheakleyhr.com. Taken together, these representations could not only sow confusion as the source of the PEO services, but also strongly imply affiliation—an affiliation not endorsed by Grubbs, the actual owner of Tri-Serve.

Plaintiffs have therefore stated a claim for improper use of trade name and false designation of origin for which the Sheakley Entity Defendants may be held vicariously liable.

## II.    False advertising

Plaintiffs also assert that the e-mail to twenty-two Tri-Serve customers also constituted false advertising by Strunk-Zwick and the Sheakley Entity Defendants. The Lanham Act also establishes liability for:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a).

### A.    Relevant Test

This Court has established a five-part test for establishing a false advertising claim:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the

advertisements were introduced into interstate commerce; 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999).   The statements need not have appeared in a format resembling traditional advertising.  *See, e.g., Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112–14 (6th Cir. 1995) (holding misstatements in trade journal article actionable as false advertising).

### B.      The *Gordon & Breach* Test

While repeating the test above, the court below used a different test first developed by the Southern District of New York in *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994), which is employed in many other circuits to determine whether a statement is made in "commercial advertising or promotion."   The statement must be:

> (1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing customers to buy the defendant's goods or services; (4) *that is disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry*.[4]

*Grubbs v. Sheakley Grp.*, No. 1:13cv246, 2015 WL 1321126, at \*7 (S.D. Ohio Mar. 18, 2015) (emphasis added).  The court below treated discussion of the *Gordon & Breach* test by this Court in *LidoChem v. Stoller Enterprises, Inc.*, 500 F. App'x 373, 379 (6th Cir. 2012), as though it were the established law of this Circuit.  The court below went on to find that the e-mails to twenty-three recipients were not widely disseminated enough as to constitute advertising or promotion in the PEO industry.  The Sheakley Defendants and Strunk-Zwick urge us to affirm on this ground, while Plaintiffs assert that they have stated a claim for false advertising under the *Podiatric Physicians* test.   In essence, the parties dispute the reach of the Lanham Act with respect to false advertising claims, which we now examine.

---

[4]Many circuits have adopted this test wholesale.  *See, e.g., Suntree Tech., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012); *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003); *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273–74 (10th Cir. 2000); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999); *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996).  Other circuits have adopted aspects of the four-part test.  *See Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999) (adopting the test but defining advertising as communication that "propose[s] a commercial transaction").

*LidoChem* concerned rival chemical corporations producing competing agricultural chemicals for the Western Michigan market. 500 F. App'x at 374–75. At issue were a falsified lab report that the defendant corporation provided to a large soybean grower whose plants became yellow after being sprayed with the plaintiff's product, and subsequent false statements of fact in letters to the soybean grower's attorney. *Id.* at 375–77. Faced with a situation in which it was unsure whether certain statements were made in "commercial advertising or promotion," as the statute requires, the *LidoChem* court turned to the *Gordon & Breach* test, and decided that they were. *See LidoChem*, 500 F. App'x at 379–81. *LidoChem*, we note, was an unpublished decision that is not binding on subsequent panels of this Court but may be considered for its persuasive authority. *See, e.g., United States v. Webber*, 208 F.3d 545, 551 n. 3 (6th Cir. 2000). *LidoChem* in no way disavowed *Podiatric Physicians*, and indeed recognized it as the law of this Circuit. 500 F. App'x at 380. At the same time, the *LidoChem* decision instructs us how the *Podiatric Physicians* test is itself not always instructive: under *Podiatric Physicians*, plaintiffs state a claim for false advertising when they plead, among other things, that an *advertisement* containing false or misleading statement of fact entered interstate commerce. As *LidoChem* tacitly acknowledged, *Podiatric Physicians* is silent as to what constitutes advertising (and, in its most frequently cited formulation, does not mention promotion at all). *Podiatric Physicians* thus advanced a test that does not define its own scope.

In some cases, it may be obvious whether statements were made in "advertising or promotion." Yet, as noted above, communications need not necessarily resemble traditional television, radio, print, or Internet advertisements to fall within the purview of the Lanham Act. *Semco*, 52 F.3d at 112. *Semco*, decided prior both to *Podiatric Physicians* and to any Circuit's adoption of the *Gordon & Breach* test, declined to "divine the true meaning of 'commercial advertising and promotion.'" *Id.* Defendants facing false advertising claims, as here, may understandably seek to evade liability by arguing that contested statements did not constitute "commercial advertising or promotion" and are thus outside the ambit of the statute. That the district courts of this Circuit have frequently looked to the *Gordon & Breach* test in the absence of a definition of "commercial advertising or promotion" suggests a desire for additional clarity beyond our existing precedent. *See, e.g., Champion Labs., Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 694 (E.D. Mich. 2009); *White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d

869, 897 (N.D. Ohio 2008); *Kansas Bankers Sur. Co. v. Bahr Consultants, Inc.*, 69 F. Supp. 2d 1004, 1012 (E.D. Tenn. 1999) (all applying *Gordon & Breach* test).

The *Gordon & Breach* test represents but one attempt to make sense of the elusive phrase "commercial advertising or promotion," which is defined neither in statute nor in legislative history. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (quoting *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1383 (5th Cir. 1996)). Discussing the *Gordon & Breach* test, the Seventh Circuit expressed "serious doubts about the wisdom of displacing the statutory text in favor of a judicial rewrite with no roots in the language Congress enacted." *First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir. 2001). The court proceeded to define advertising, according to what it considered its common usage, as "a form of promotion to anonymous recipients, as distinguished from face-to-face communication" and "a subset of persuasion [that] refers to dissemination of prefabricated promotional material." *Id.* at 803–804.

The Second Circuit considered each part of the *Gordon & Breach* test separately. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56–58 (2d Cir. 2002). It began with the common meanings of the words in the statute, and "easily accept[ed] the first and third elements of the *Gordon & Breach* test that define the term 'commercial' as referring to 'commercial speech' that is made for the purpose of influencing the purchasing decisions of the consuming public." *Id.* at 56-57. Regarding *Gordon & Breach*'s dissemination requirement, it stated:

> The ordinary understanding of both "advertising" and "promotion" connotes activity designed to disseminate information to the public. Thus, the touchstone of whether a defendant's actions may be considered "commercial advertising or promotion" under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement.

*Id.* at 57. Critical to the court's adoption of the market penetration requirement was its conclusion that, "[a]lthough the Lanham Act encompasses more than the traditional advertising campaign, the language of the Act cannot be stretched so broadly as to encompass all commercial speech." *Id.* (citing *Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996,

1005 (10th Cir. 2002) and *First Health Grp.*, 269 F.3d at 803). The Second Circuit did not adopt the requirement of the *Gordon & Breach* test that plaintiffs and defendants be in competition, which it noted was not required by the statute itself. *Id.* at 58.

It is time to revisit *Semco*'s unwillingness to define the term "commercial advertising or promotion." Like the Second Circuit, we readily adopt the first and third requirements of the *Gordon & Breach* test: namely, that "commercial advertising or promotion" must consist of "'commercial speech' that is made for the purpose of influencing the purchasing decisions of the consuming public." *Id.* at 57. These criteria add only an intent requirement to the *Podiatric Physicians* test, which requires plaintiffs to show that the supposed advertisements "will likely influence the deceived consumer's purchasing decisions." 185 F.3d at 613.

We further agree with the Second Circuit that "the touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique*, 314 F.3d at 57. However, such campaigns, especially those aimed at previous customers, may not necessarily entail widespread, market-wide dissemination of any given message or false statement as junk mail, newspaper advertisements, and television commercials might; producers today employ data as never before to track our consumption habits, especially on the Internet, and send out personalized promotional material accordingly. We may see web advertisements based on our internet search history or use of social media sites like Facebook, or receive e-mails from airlines regarding sales on routes we regularly travel or flyers advertising "friends and family" sales for stores we patronize. Such targeted promotion reflects a belief by advertisers that discrete segments of a much larger existing or potential customer base may find specific messages most persuasive. In engaging in this sort of targeted promotion, advertisers may undertake an organized campaign to penetrate a market without any given message flooding that market. In other words, the most focused advertisements or promotions may not be widely disseminated at all.

We believe that the requirement of "widespread dissemination" or "market penetration" fails sufficiently to account for the types of sophisticated, tailored advertising in use today, and that the plain meaning of the terms "commercial advertising" or "commercial promotion"

accommodates targeted communications to a substantial portion of a company's existing customer or client base. At the same time, we recognize the concern of other courts in rendering too much commercial speech actionable as false advertising. *See Seven-Up*, 86 F.3d at 1384 (discussing a district court's concern that to "permit a single private correspondence" to fall within this subsection of the Lanham Act "would sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction"). We therefore define "commercial advertising or promotion" as: (1) commercial speech; (2) for the purpose of influencing customers to buy the defendant's goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry or to a substantial portion of the plaintiff's or defendant's existing customer or client base.

We decline to adopt the requirement that the parties be in competition. Obviously, defendants who are in direct competition with plaintiffs may falsely denigrate their competitors' products or make equally false statements about the merits of their own, and are indeed the most likely source of such false advertising. But, as the Second Circuit noted, because the statute nowhere requires such a showing by plaintiffs, we will not impose one. *See Fashion Boutique*, 314 F.3d at 58.

Turning now to the facts of this case, we believe that the letter to all of Tri-Serve's clients, fits squarely within this definition of "commercial promotion." The letter to the twenty-two clients touted the many advantages of the purported "partnership" with Sheakley:

> By moving into Sheakley Group we will be able to provide you and your employees with additional resources, services, and benefits, while continuing to provide you with the service that you have grown accustomed to expect from TriServe . . . You will begin to see the Sheakley HR name and we will be introducing new benefits and new services to assist you with growing your business.

(R. 87, Compl. ¶ 840, Page ID 3185.) As Plaintiffs plead in their Complaint, this e-mail represented the culmination of a plan to move the Tri-Serve clients to Sheakley, and intended to induce them into transferring their business. With that in mind, we turn to the traditional *Podiatric Physicians* factors.

C.      **Application of the *Podiatric Physicians* factors**

1.      **False or misleading statements of fact**

In the context of the allegations throughout the complaint that Strunk-Zwick did not own Tri-Serve, had no authority to transfer its clients, and then allowed its entire client base to be subsumed into Sheakley, the e-mails and mailings from Strunk-Zwick to customers contain several false and misleading statements of fact concerning Tri-Serve's product, PEO services. The July 3, 2009 e-mail and mailing to customers stated that "we are partnering with Sheakley HR," and that Tri-Serve was "moving into Sheakley Group" because of "tremendous growth over the last 6 months." It also gave a future address of "TriServe LTD c/o Sheakley HR Solutions." Plaintiffs specifically assert that the references to "partnering" and the "move" are false: Tri-Serve was not moving and the companies had no relationship whatsoever. The supposed address of "TriServe LTD c/o Sheakley HR Solutions" at One Sheakley Way was also a false representation of the geographic origin of the PEO services and could also have created a further misimpression as to the relationship between the companies.

2.      **Deception of the intended audience**

Plaintiffs seeking damages for false advertising must "present evidence that a 'significant portion' of the consumer population was deceived." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) (citing *Podiatric Physicians*, 185 F.3d at 616). The e-mails and mailings appear to have deceived the Tri-Serve customers who received them. By August 2009, health insurers and workers' compensation departments were billing Tri-Serve at Grubbs' office, but clients were sending their payments to Sheakley, not Grubbs. Where false advertising cases have involved only mass mailings—albeit several orders of magnitude more than at issue here—this Court has treated the intended audience as the recipients of the letters. *See Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 686 (6th Cir. 2000) (successive mass mailings to 2,500 and 3,200 clients and potential clients); *Podiatric Physicians*, 185 F.3d at 611 (mass mailings of 6,000-8,000 letters).

### 3.      Causation

The third and fifth prongs of the test, which require a plaintiff to show that the statement will likely influence the deceived consumer's purchasing decisions and that the challenged statements caused harm to the plaintiff, both address "causation generally." *Podiatric Physicians*, 185 F.3d at 613. The false address and statements about "partnering" would likely cause a consumer, assuming it was still paying Tri-Serve, to send funds to Sheakley, which they apparently did by August at the latest.

### 4.      Interstate commerce nexus

Finally, Plaintiffs must show that the statements were introduced into interstate commerce. Often, the very scope of a mass promotional campaign allows a court to gloss over this element of the *Podiatric Physicians* test. For example, it would be easy for a court simply to assume that some letters out of a mass mailing of thousands entered interstate commerce. *See Balance Dynamics*, 204 F.3d at 687.

The Internet, which the Supreme Court has described as "an international network of interconnected computers," and which facilitates the constant flow of e-mail, enables interstate commerce of many types to occur. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 849 (1997) (describing the history of the Internet and types of communication through its portals). When e-mails or files attached to them cross state lines, they travel in interstate commerce. *See, e.g., United States v. Chambers*, 441 F.3d 438, 449 (6th Cir. 2006). Plaintiffs do not allege in their Complaint that the e-mail, or the mailed versions thereof, ever traveled outside Ohio. Plaintiffs did not specify where the recipients of the e-mail were located, or where any of the relevant e-mail servers might have been. The question is whether Plaintiffs nonetheless pled that the e-mails were introduced into interstate commerce.

The most instructive discussions of whether e-mails necessarily travel in interstate commerce arise in the criminal context. *See, e.g., United States v. Lay*, 612 F.3d 440, 447 (6th Cir. 2010) (affirming wire fraud conviction where e-mails were sent between states). The recent case of *United States v. Napier*, 787 F.3d 333, 346 (6th Cir. 2015), specifically rejected the defendant's argument that the government needed to establish where the recipient of an e-mail

containing child pornography was located.  The "relevant inquiry" for interstate commerce purposes for a sufficiency of the evidence challenge by a criminal defendant was "whether there is enough circumstantial evidence that these electronic communications were transmitted through interstate wires. Given the omnipresent nature of the Internet, this is not a difficult burden for the government to satisfy."  *Id.*  *Napier* approvingly cited case law from other circuits to the effect that no showing was necessary that transmissions had crossed state lines.  *Id.* (collecting cases from the First, Second, Third, Fourth, and Fifth Circuits).  However, it stopped short of adopting an unequivocal rule to that effect because of circumstantial evidence that the images had traveled between different time zones.  *United States v. Mellies* also discussed this body of law with approval, but declined to hold that e-mail or Internet transmissions always move in interstate commerce because the parties had not addressed the issue in their briefs.  329 F. App'x 592, 605 (6th Cir. 2009).

In light of this guidance, we hold that a civil plaintiff need not allege that an e-mail crossed state lines to survive a motion to dismiss.  *Napier* specifically stated that the government—which, by the time of trial, would necessarily have concluded its investigation—need not prove the location of an e-mail recipient to establish an interstate nexus, and we believe it would be unfair to impose a more stringent burden on a plaintiff in a civil case who has not yet had the benefit of discovery.  To survive a motion to dismiss, a plaintiff must allege "factual content that allows the court to draw the reasonable inference" that the supposed false advertisements were introduced into interstate commerce.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Stating that an e-mail was sent is enough.  In so holding, we join the Seventh Circuit that the very act of sending an e-mail creates the interstate commerce nexus necessary for federal jurisdiction.  *See Doe v. Smith*, 429 F.3d 706, 709–10 (7th Cir. 2005) (holding interstate commerce nexus met and reversing grant of motion to dismiss for failure to state a claim under the Wiretap Act where counsel stated at oral argument that defendant had e-mailed a video).

For these reasons, and because the Sheakley Entity Defendants may be held vicariously liable for Strunk-Zwick's e-mail as described above, Plaintiffs have stated a claim for false advertising against Strunk-Zwick and the Sheakley Entity Defendants.

## III.　RICO claims

Plaintiffs further allege that Strunk-Zwick and all Sheakley Defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO) with their plan to steal Tri-Serve's client base.　RICO prohibits

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).　Both individuals and corporate entities may be held liable under RICO; a person "includes any individual or entity capable of holding a legal or beneficial interest in property."　18 U.S.C. § 1961(3).　"Racketeering activity" encompasses many criminal acts, including those indictable for mail or wire fraud.[5]　*See* 18 U.S.C. § 1961(1).　Finally, the statute requires at least two acts of racketeering activity within ten years to qualify as a "pattern of racketeering activity."　18 U.S.C. § 1961(5).　The RICO statute allows a civil remedy to persons injured by a violation of 18 U.S.C. § 1962(c).　18 U.S.C. § 1964(c).

In practice, two acts of racketeering activity within ten years will not generally give rise to liability.　Predicate acts of racketeering must be both continuous and related to "'combine[] to produce a pattern.'"　*Fleischhauer v. Feltner*, 879 F.2d 1290, 1297 (6th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, n. 14 (1985)).　In assessing continuity and relatedness, courts consider several factors: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries."　*Fleischhauer*, 879 F.2d at 1298.　Continuity, for RICO purposes, "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."　*Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989)).

---

[5]To establish RICO liability, predicate acts of mail or wire fraud must be pled with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.　*See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012).

The court below dismissed both the substantive RICO claim and the RICO conspiracy claim on the ground that Plaintiffs failed to plead either closed- or open-ended continuity: the alleged racketeering acts of mail and wire fraud occurred within an eight-month period in pursuance of a single scheme with a single victim, and Plaintiffs pled no facts indicating that the alleged acts of racketeering activity would continue into the future.

The Sheakley Defendants and Strunk-Zwick ask this court to affirm the ruling of the court below finding lack of continuity.  Plaintiffs, they argue, did not show that the conduct lasted long enough to constitute a closed-ended RICO violation, and did not show enough potential to continue into the future for open-ended liability.  They rely principally on several cases denying RICO claims where the alleged racketeering activity occurred over periods ranging from six to seventeen months, and where plaintiffs had not shown any threat of future conduct.  *See Moon*, 465 F.3d at 725–26 (affirming dismissal of RICO complaint for lack of continuity where predicate acts occurred over nine months); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134–35 (6th Cir. 1994) (seventeen months); *Vild v. Visconsi*, 956 F.2d 560, 569–70 (6th Cir. 1992) (six or seven months).  The Sheakley Defendants also argue that the alleged activity was a single, terminable scheme with only one victim that was, by nature, not open-ended.  *See Moon*, 465 F.3d at 725 (no RICO liability where defendant had "single objective" and there were "no facts suggesting that the scheme would continue beyond the [d]efendants accomplishing their goal"); *Vemco*, 23 F.3d at 134 (no RICO liability where there was a "single victim and a single scheme for a single purpose").

Plaintiffs contend that their Complaint pled facts sufficient to support open-ended continuity of racketeering activity because the acts, admittedly committed within eight months, were "continuous in that they are capable of being continued into the future and pose that threat of continuing for a lengthy period of time." (Pls.' Br. at 43.)  One may indeed establish the threat of continued criminal activity by showing that the predicate acts are part of the "'regular way of conducting [a] defendant's ongoing legitimate business.'"  *Vild*, 956 F.2d at 569 (quoting *H.J.*, 492 U.S. at 243).  However, Plaintiffs have not done so with respect to Strunk-Zwick or any of the Sheakley Defendants.  They argue, with no citation to the record, that the "ends justify the means [sic] management style" of Sheakley—in which Sheakley failed to respect the

confidentiality of client lists—gives "no indication that their pattern of behavior would not continue indefinitely into the future." (Pls.' Br. at 45–46.) As support for their position in favor of open-ended liability, they cite *United States v. Busacca*, in which a RICO conviction was upheld where a defendant embezzled pension funds from his union six times within two and a half months to pay his own legal fees in a prior RICO case. 936 F.2d 232, 237–38 (6th Cir. 1991). In *Busacca*, we considered the defendant's total control of the pension funds, disregard of procedures, and repeated misstatements to the union board to have created an ongoing risk of criminal activity at the time the acts were committed that was fortuitously interrupted by his conviction. *Id.* at 238.

The facts in the Complaint, accepted as true, make this eight-month course of conduct more analogous to the short-term, terminable schemes in *Moon*, *Vemco*, and *Vild* than the unusual circumstances of control in *Busacca*, let alone the "long-term criminal conduct" the RICO statute was enacted to combat. *See H.J.*, 492 U.S. at 242 (citing legislative history). According to the pleadings, the wire fraud began in the first half of 2009; the most recent alleged act of wire fraud occurred on August 30, 2009, when Strunk-Zwick claimed not to have tax documents. As noted, Plaintiffs alleged no further facts showing that Sheakley threatened future criminal conduct. Thus, this single eight-month scheme to move the Tri-Serve clients to Sheakley with the single victim of Grubbs cannot meet the standard for closed- or open-ended RICO liability. We therefore affirm the district court's dismissal of Plaintiffs' substantive RICO claim.

This result is fatal to the RICO conspiracy claim Plaintiffs seek to assert pursuant to 18 U.S.C. 1962(d). To state a claim for RICO conspiracy, one must "successfully allege all the elements of a RICO violation, as well as . . . 'the existence of an illicit agreement to violate the substantive RICO provision.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 411 (6th Cir. 2012) (quoting *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983)). While the facts, as pled, show ample evidence of agreement on the part of Strunk-Zwick and various individual Sheakley Defendants to bring Tri-Serve to Sheakley, Plaintiffs' RICO conspiracy claim fails because Plaintiffs failed to allege a substantive RICO violation in the first place.

**IV.      State law claims**

Plaintiffs ask this Court to reinstate their state-law claims if any of their Lanham Act or RICO claims are reinstated.  The decision to hear state-law claims over which a federal court has pendent jurisdiction is within the discretion of the trial court.  28 U.S.C. 1367(a).  We review the decision of the district court to exercise supplemental jurisdiction for abuse of discretion.  *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).  The court below specifically predicated the dismissal of the state law claims on the lack of any remaining federal law claims, and we do not consider it to have abused its discretion in so ruling.  However, the district court on remand should re-examine whether to exercise its discretion to hear any of the remaining state law claims.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the order of the district court dismissing Plaintiffs' Lanham Act claims for failure to state a claim and **AFFIRM** the order of the district court dismissing Plaintiffs' RICO claims.  We **REMAND** this case for further proceedings, in which the district court may, in its discretion, re-examine whether to reinstate any of Plaintiffs' state law claims.